UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| J. GRAHAM ZAHORUIKO, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:15-cv-474 (VLB) |
| | : | |
| v. | : | |
| | : | February 28, 2017 |
| FEDERAL INSURANCE COMPANY and | : | |
| CHUBB GROUP OF INSURANCE | : | |
| COMPANIES, Collectively and | : | |
| Individually, | : | |
| | : | |
| Defendants. | : | |

MEMORANDUM OF DECISION GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. 34]

I.    Introduction

Plaintiff J. Graham Zahoruiko brings this action for breach of contract, unjust enrichment, conversion, and for declaratory relief, against Defendants Federal Insurance Company ("Federal") and Chubb Group of Insurance Companies, individually and collectively ("Chubb"), for denying coverage under a directors and officers ("D&O") liability insurance policy.  Federal moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.  [Dkt. 34].  For the reasons that follow, the Court GRANTS Federal's motion.

II.    Background

Plaintiff was an officer of SpaceWeb Corporation ("SpaceWeb"), which was later known as Refresh Software Corporation ("Refresh"), while these companies were insured under two Federal D&O policies.  [Dkt. 14 ¶¶ 7, 11; Dkt. 40 ¶¶ 4, 5, 7].  Federal issued SpaceWeb its first policy (the "SpaceWeb Policy") on October 1,

1

2000.  [Dkt. 35 ¶ 5].  The SpaceWeb Policy was canceled for non-payment of premium on or about May 26, 2001.  [Dkt. 35 ¶ 6].  Federal then issued a new, separate policy to Refresh (the "Refresh Policy") effective December 14, 2002.  [Dkt. 35 ¶ 2].  The Refresh Policy remained effective until April 14, 2011.  [Dkt. 35 ¶ 7].

A. __The Policies__

Both policies are "claims-made" policies, which provide coverage based on when a claim is first made rather than when the events giving rise to the claim took place.  [Dkt. 35-1, Declarations, at 1; Dkt. 35-2, Declarations, at 1].  The SpaceWeb Policy states:

> THIS IS A CLAIMS MADE POLICY.  EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD.

[Dkt. 35-1, Declarations, at 1].  The Refresh Policy states,

> THIS COVERAGE SECTION PROVIDES CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO "CLAIMS" FIRST MADE DURING THE "POLICY PERIOD", OR ANY EXTENDED REPORTING PERIOD.

[Dkt. 35-2, D&O Liability Coverage Section, at 1].  The parties do not dispute that the Plaintiff was an "insured person" under these policies.  [Dkt. 34-1 at 9].

The Policies both define a D&O Claim as:

> (a) a written demand for monetary damages;[1]
>
> (b) a civil proceeding commenced by the service of a complaint or similar pleading

[Dkt. 35-1, Declarations, at 16; Dkt. 35-2, D&O Liability Coverage Section, at 4].  A "Loss" under the Refresh Policy was defined as:

---

[1] The Refresh Policy also includes in the D&O Claim definition a written demand for "nonmonetary relief."  [Dkt. 35-2, D&O Liability Coverage Section, at 4].

> [T]he total amount which an Insured becomes legally obligated to pay as a result of any Claim made against any Insured for Wrongful Acts,[2] including, but not limited to, damages (including punitive or exemplary damages which has a substantial relationship to the Insureds, the Company, this Policy or the Claim and which is most favorable to the insurability of such damages), judgments, settlements, pre-judgment and post-judgment interest and Defense Costs.

*Id.*  Additionally, to obtain coverage for losses under the D&O policy, an insured could not:

> [S]ettle any Claim, incur any Defense Costs, or otherwise assume any contractual obligation or admit any liability with respect to any Claim without [Federal's] written consent, which shall not be unreasonably withheld.  [Federal] shall not be liable for any settlement, Defense Costs, assumed obligation or admission to which it has not consented.

[Dkt. 35-2, General Terms and Conditions, at 9].  The policy also required the insured to provide Federal "written notice as soon as practicable of any Claim."

*Id.* at 8.  The Refresh Policy also provides that:

> No coverage will be available under this Coverage Section for any Claim against an Insured . . . based upon, arising from, or in consequence of a written demand, suit, or other proceeding pending, or order, decree or judgment entered for or against any Insured on or prior to the applicable Pending or Prior Litigation Date . . . or the same or any substantially similar fact, circumstance or situation underlying or alleged therein.

---

[2] A "Wrongful Act" was defined, in relevant part as:

> (1) any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted by:
>
> > (a) . . . any Insured Person in his or her capacity as [an executive or employee of the Insured Organization], or any matter claimed against any Insured Person solely by reason of his or her status as [an executive or employee of the Insured Organization].

[Dkt. 35-2, D&O Liability Coverage Section, at 5-6].

[Dkt. 35-2, D&O Liability Coverage Section, at 6].  Further, it states that "Related Claims"[3] will be treated as "a single Claim made when the earliest of such Related Claims was first made."  [Dkt. 35-2, General Terms and Conditions, at 5].

B. <u>The Claim</u>

On May 26, 1999, Plaintiff completed a line of credit application with Fleet Bank, acting as President of SpaceWeb.  [Dkt. 36-1 at 2].  Plaintiff executed a note for this line of credit ("1999 Note") as President of SpaceWeb, and executed a personal guaranty.  *Id.*  On July 1, 2002, a third-party called Premier Capital LLC ("Premier Capital") purchased the 1999 Note.  [Dkt. 35-8].  On August 8, 2002, Premier Capital sent a letter to Refresh and the Plaintiff, declaring that the 1999 Note was in default, and demanding payment of the balance.  *Id.*

On October 29, 2002, Premier Capital filed a lawsuit against Refresh and Plaintiff in Massachusetts Superior Court, *Premier Capital LLC v. Refresh Software Corp.*, No. 02-4566.  [Dkt. 35-7 at 14-21].  Service was returned by the Plaintiff [Dkt. 35-9 at 6].  The Refresh Policy was issued on December 14, 2002. [Dkt. 35 ¶ 2].  Premier Capital asserted claims against Refresh for breaching its obligations under the 1999 Note, and a second claim against Plaintiff for failing to fulfill his obligations as guarantor of the 1999 Note.  *Id.*  On June 16, 2003, the clerk entered default against Refresh and the Plaintiff.  [Dkt. 35-9 at 6].  Neither

---

[3] Defined as "Claims for Wrongful Acts based upon, arising from, or in consequence of the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events."  [Dkt. 35-2, General Terms and Conditions, at 5].

Refresh nor Plaintiff notified Federal of the demand letter or the accompanying lawsuit.  [Dkt. 35 ¶ 11].

On July 1, 2003, the Plaintiff, Refresh, and Premier Capital executed a settlement agreement, and a stipulation of voluntary dismissal was entered in the Massachusetts action.  [Dkt. 35-9 at 6; Dkt. 35-10 at 1].  The settlement agreement was executed without Federal's knowledge or participation, and required Refresh and the Plaintiff to execute a second promissory note (the "2003 Note") as consideration for releasing all claims under the 1999 Note.  [Dkt. 35 ¶ 13; Dkt. 35-10 at 1].  Refresh and Premier Capital executed this note, with the Plaintiff again signing a personal guaranty.  [Dkt. 35-11 at 5].

On July 10, 2010, Premier Capital filed a second suit in Massachusetts Superior Court, alleging that Refresh and Plaintiff failed to meet their obligations under the 2003 Note.  [Dkt. 35-13].  Plaintiff was served on or about August 25, 2010.  [Dkt. 35-13 at 5].  Premier Capital alleged that Refresh began missing loan payments in May 2008, immediately before a final "balloon" payment was due.  *Id.* at 1.  In response, on May 30, 2008, Premier and Refresh, with the Plaintiff as guarantor, executed a forbearance agreement, which delayed the balloon payment until April 30, 2012.  [Dkt. 35-12].

In the forbearance agreement, Premier Capital agreed "to forbear executing on the collateral and extend the time for final payment of the note" in consideration for a one-time forbearance fee of three percent of the loan balance, monthly loan payments, and an agreement to pay the full balance on a new maturity date.  *Id.* ¶ 3.  The agreement also stated that "[t]his Agreement does not

in any way cure any outstanding default of terms under this Forbearance
Agreement," and that in the event of a default, "Premier may immediately proceed
with execution on any and all collateral and assets of REFRESH without notice."
*Id.* Refresh further agreed that it would not:

> "(i) waive, not plead and not assert any defense(s) based on the lapse of
> time between the date of the original Promissory Note and an event of
> default; (ii) agree to waive any applicable statute of limitations,
> presentment, demand for payment, protest and notice of dishonor . . . [and]
> waive any requirement or obligation of holder to post a bond or other
> security in connection with any prejudgment remedy obtained by holder
> based on any offsets, claims, defenses or counterclaims of Obligors or any
> other obligated party to any action brought by holder."

*Id.* Refresh also acknowledged and represented to Premier Capital that "[T]he
aggregate legal balance of the Loan outstanding is due and owing from REFRESH
to PREMIER without any defense, offset or counterclaim of any kind[] or nature
whatsoever." *Id.* ¶ 4. Plaintiff signed the forbearance agreement in his capacity
as President of Refresh and as the loan's guarantor. *Id.* at 5.

On February 3, 2012, Premier Capital notified the Plaintiff that it intended to
Plaintiff a demand letter on April 29, 2010, prior to filing suit. Plaintiff and Refresh
filed answers and counterclaims in the 2010 case, and motion practice relating to
the attachment of real estate proceeded in March of 2011. [Dkt. 35-14 at 7].
Between March and September 2011, no documents were filed on the 2010 case's
docket. *Id.* In September 2011, litigation recommenced, with the court
considering the withdrawal of plaintiff's counsel, a joint trial memorandum, and
motions regarding the assessment of damages. *Id.*

On February 3, 2012, Premier Capital notified the Plaintiff that it intended to
seek summary judgment. [Dkt. 35-15]. Ten days later, on February 13, 2012,

Plaintiff notified Federal of the pending lawsuit.  [Dkt. 35 ¶ 8; Dkt. 35-3; Dkt. 35-4].
On February 28, 2012, Premier Capital filed its motion for summary judgment.
[Dkt. 35-14 at 7].  Federal denied coverage by letter dated March 8, 2012.  [Dkt. 35-4].  On March 28, 2012, the Massachusetts Superior Court granted summary
judgment, dismissed counterclaims, and directed the clerk to schedule an
assessment of damages hearing.  *Id.* at 7-8.

Plaintiff filed the instant case on April 1, 2015, alleging that Federal's failure
to cover losses from the 2010 lawsuit caused his default on the 2003 Note, as
modified by the 2008 forbearance agreement.  [Dkt. 1-1].

III.  <u>Standard of Review</u>

Summary judgment should be granted "if the movant shows that there is
no genuine dispute as to any material fact and the movant is entitled to judgment
as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of
proving that no factual issues exist.  *Vivenzio v. City of Syracuse*, 611 F.3d 98,
106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is
required to resolve all ambiguities and credit all factual inferences that could be
drawn in favor of the party against whom summary judgment is sought.  *Id.*
(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita
Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  "If there is any
evidence in the record that could reasonably support a jury's verdict for the
nonmoving party, summary judgment must be denied."  *Am. Home Assurance
Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006)
(quotation omitted).  In addition, the court should not weigh evidence or assess

7

the credibility of witnesses" on a motion for summary judgment, as "these determinations are within the sole province of the jury."  *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

"A party opposing summary judgment 'cannot defeat the motion by relying on the allegations in [her] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.'  At the summary judgment stage of the proceeding, [p]laintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (quoting *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996).  "Summary judgment cannot be defeated by the presentation . . . of but a 'scintilla of evidence' supporting [a] claim."  *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).

IV.    <u>Discussion</u>

Plaintiff argues that Federal is liable for breach of contract, because it failed to cover losses as set forth in the Federal Policy.  An insurance policy "is to be interpreted by the same general rules that govern the construction of any written contract."  *Zulick v. Patrons Mut. Ins. Co.*, 287 Conn. 367, 372-73 (2008).  Any contract "must be construed to effectuate the intent of the parties, which is determined from the language used and interpreted in the light of the situation of the parties and the circumstances connected with the transaction."  *Murtha v. City of Hartford*, 303 Conn. 1, 7-8 (2011) (quoting *Remillard v. Remillard*, 297

8

Conn. 345, 355 (2010)); *Harbour Pointe, LLC v. Harbour Landing Condominium Ass'n, Inc.*, 300 Conn. 254, 260 (2011) ("In ascertaining the contractual rights and obligations of the parties, we seek to effectuate their intent, which is derived from the language employed in the contract, taking into consideration the circumstances of the parties and the transaction." (quotations omitted)).

Where the language of a contract is unambiguous, a court "must give the contract effect according to its terms." *Harbour Pointe*, 300 Conn. at 260 (quoting *Cantonbury Heights Condominium Ass'n Inc. v. Local Land Dev., LLC*, 273 Conn. 724, 734-35 (2005)). A contract is unambiguous when "its language is clear and conveys a definite and precise intent . . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity." *Id.* "[T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." *Id.*

Where the language of an insurance policy is ambiguous, such language must be construed against the insurance company that drafted the policy. *See Springdale Donuts, Inc. v. Aetna Cas. & Sur. Co.*, 247 Conn. 801, 806 (1999). However, any ambiguity in a contract "must emanate from the language used by the parties" and "a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself." *Murtha*, 300 Conn. at 9. "The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so . . . . If the language of the contract is susceptible to more than one

reasonable interpretation, the contract is ambiguous." *Harbour Pointe*, 300 Conn. at 261 (quoting *Cantonbury Heights*, 273 Conn. at 735).

## A. SpaceWeb Policy Coverage

A claims-made policy is "an insurance policy or an endorsement to an insurance policy that covers liability for injury or damage that the insured is legally obligated to pay (including injury or damage occurring prior to the effective date of the policy, but subsequent to the retroactive date, if any), arising out of incidents, acts or omissions, as long as the claim is first made during the policy period or any extended reporting period.  [T]he purpose behind 'claims made' insurance [is] to limit [the insurer's] liability to a fixed period of time.  This increased certainty permits an insurer to charge lower premiums for this particular species of policy."  *Nat'l Waste Assocs., LLC v. Travelers Cas. & Sur. Co. of Am.*, 51 Conn. Supp. 369, 374 (Super. Ct. 2008), *aff'd*, 294 Conn. 511 (2010) (quotations and citations omitted) (The Connecticut Supreme Court adopted the trial court's "concise and well-reasoned decision as a statement of . . . the applicable law on the issues.").

It is undisputed that SpaceWeb, Refresh, and the Plaintiff were not covered by any liability policy between May 26, 2001 and December 14, 2002, [Dkt. 35 ¶¶ 2, 6], and that both Policies define a "claim" as a written demand for damages or a civil suit.  [Dkt. 35-1, Declarations, at 16; Dkt. 35-2, D&O Liability Coverage Section, at 4].  It is similarly undisputed that the demand letter for the 2002 suit was received on August 8, 2002, and that the complaint was filed on October 29, 2002 and served on or about November 25, 2002.  Therefore, at the time the

"claims" relating to the 1999 Note were made, Plaintiff was not covered under either policy.  Because no claims were made during the SpaceWeb Policy period, the terms of this policy are irrelevant to the instant case.

However, the parties do not dispute that with respect to the 2010 lawsuit, Plaintiff received the demand letter and was served the complaint within the Refresh Policy period.  While Federal has offered seven separate grounds for excluding coverage under the Refresh Policy, the Court need only discuss two: (1) whether coverage for the 2010 lawsuit must be excluded as "related" to the 2002 lawsuit; and (2) whether the Plaintiff complied with the Refresh Policy's notice requirements.

   **B.  Related Claim and/or Pending or Prior Litigation Exclusion**

Federal argues that the pending or prior litigation exclusion bars coverage for the 2010 case.  The exclusion bars coverage for losses "based upon, arising from, or in consequence of a written demand, suit, or other proceeding pending, or order, decree or judgment entered for or against any Insured on or prior to the applicable Pending or Prior Litigation Date . . . or the same or any substantially similar fact, circumstance or situation underlying or alleged therein."  [Dkt. 35-2, D&O Liability Coverage Section, at 6].  Federal also argues that the 2010 claim is related to the 2002 claim, because it is as "based upon, arising from, or in consequence of the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events."  [Dkt. 35-2, General Terms and Conditions, at

5].  The policy states that related claims should be treated as a single claim.  *Id.* at 8.

     "The purpose of the prior litigation exclusion provision is so that insurance companies can be apprised of events that might blossom into a covered event during the policy period."  *Nat'l Waste*, 51 Conn. Supp. at 381 (Super. Ct. 2008).  A "major drawback" to claims-made policies "from the insurer's standpoint is that it may face exposure for wrongful acts performed in the past, not just during the policy period, and, therefore, it is not uncommon for the policy to limit the time period of coverage for prior acts by including a retroactive date."  *Am. Home Assur. Co. v. Abrams*, 69 F. Supp. 2d 339, 347 (D. Conn. 1999).  "To permit an insured to recover for claims arising from the same facts, circumstances, situations, transactions, events or wrongful acts alleged in a pending lawsuit or made the subject of a prior notice given to another insurer would be to grant the insured more coverage than he bargained for and paid for, and to require the insurer to provide coverage for risks not assumed."  *Nat'l Waste*, 51 Conn. Supp. at 38 (quotations omitted).  "In determining whether a prior litigation clause excludes coverage, courts have focused on whether there was a sufficient factual nexus between the two lawsuits . . . .  The coverage does not depend upon the pleader's art but rather upon underlying facts."  *Id.* at 379 (quoting *Pereira v. Cogan*, No. 04 Civ. 1134 (LTS), 2006 WL 1982789, at *4 (S.D.N.Y. July 12, 2006)).

     Neither the Pending or Prior Litigation Exclusion, nor the Related Claims language apply here.  When Premier Capital agreed to settle the 2002 case, and when Plaintiff executed a new note and guaranty, disputes relating to the 1999

Note were definitively resolved and any obligations under that note were extinguished. Because each case involves the breach of a different note, they cannot be said to arise from the "same or any substantially similar fact, circumstance or situation."

### C. Timely Notification

Although the Refresh Policy does not exclude coverage under its Pending or Prior Litigation exclusion, or the Related Claims provisions, Plaintiff failed to notify Federal of his claim within the time set forth in the policy. "Under Connecticut law, absent waiver, an unexcused, unreasonable delay by an insured in notification of a covered occurrence constitutes a failure of condition that entirely discharges an insurance carrier from any further liability on its insurance contract." *State Farm Fire & Cas. Co. v. Yoel*, No. 03:13CV101 AWT, 2014 WL 4182614, at *5 (D. Conn. Aug. 21, 2014) (quoting *Arrowood Indem. Co. v. King ("Arrowood I")*, 605 F.3d 62, 77 (2d Cir. 2010)). "Connecticut requires two conditions to be satisfied before an insurer's duties can be discharged pursuant to the 'notice' provision of a policy: (1) an unexcused, unreasonable delay in notification by the insured; and (2) resulting material prejudice to the insurer." *Id.* Thus, "a policyholder who fails to give timely notice of an insurable loss does not forfeit his coverage if . . . his delay did not prejudice his insurer." *Id.* "[T]he insurer bears the burden of proving . . . that it has been prejudiced by the insured's failure to comply with a notice provision." *Id.* (quoting *Arrowood Indem. Co. v. King ("Arrowood II")*, 304 Conn. 179, 201 (2012)).

The Refresh Policy states, "Any Insured shall, as a condition precedent to exercising their rights under any Liability Coverage Section, give to [Federal] written notice as soon as practicable of any Claim."  "In the context of notice provisions, 'as soon as practicable' means 'as soon as can reasonably be expected under the circumstances[.]  The duty to give notice does not arise unless and until facts develop which would suggest to a person of ordinary and reasonable prudence that [a claim has been made] and is complied with if notice is given within a reasonable time after the claim.'"  *Arrowood II,* 304 Conn. at 199 (quoting *Plasticrete Corp. v. Am. Policyholders Ins. Co.,* 184 Conn. 231, 241 (1981)).

Defendants have offered undisputed evidence that the Plaintiff did not notify them of any claims until February 13, 2012, ten days after learning that Premier Capital intended to move for summary judgment, sixteen months after being served the 2010 complaint, 20 months after receiving a demand letter, and three years and nine months after signing a forbearance agreement with Premier Capital.  This is not "as soon as can reasonably be expected under the circumstances," and indeed, Plaintiff offers no legitimate explanation for his failure to promptly notify Federal of the claim.

Plaintiff's failure to timely notify Federal of his claim was prejudicial.  The policy states that "[n]o insured shall settle any Claim, incur any Defense Costs, or otherwise assume any contractual obligation or admit any liability with respect to any Claim without the Company's written consent . . . [and] shall not be liable for any settlement, Defense Costs, assumed obligation to which it has not

consented." [Dkt. 35-2, General Terms and Conditions, at 9].  Having failed to notify Federal of the lawsuit in a timely fashion, Plaintiff executed a forbearance agreement, in which he waived defenses to suits for non-payment of the loan, and incurred litigation costs defending the 2010 lawsuit.  He not only failed to comply with the prohibition against assuming contractual obligations and defense costs, he also prevented Federal from negotiating better repayment terms or from settling the lawsuit before the defense costs were incurred.

Plaintiff therefore is not entitled to coverage under the Refresh Policy, and his breach of contract claim must be DISMISSED.  Because he is not entitled to coverage, the remaining claims—for unjust enrichment, conversion, and a declaratory ruling—must also be DISMISSED.

## V.   Conclusion

For the foregoing reasons, Federal's Motion for Summary Judgment is GRANTED.  The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut:  February 28, 2017

15